UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                          CASE NO. 8:14-cr-486-T-23TBM
                                                                     8:16-cv-1234-T-23TBM
DAMIAN RUIZ-LOPEZ
_____/

**O R D E R**

Ruiz-Lopez moves under 28 U.S.C. § 2255 (Doc. 1) to vacate and challenges the validity of his convictions for one count of conspiracy to commit bank fraud and one count of conspiracy to commit money laundering, for which offenses he is imprisoned for seventy months. Although timely, Ruiz-Lopez's motion lacks merit because in the plea agreement he waived the right to raise the grounds he asserts in the motion to vacate.

Rule 4, Rules Governing Section 2255 Cases, requires a preliminary review of the motion to vacate. Section 2255 requires denial of the motion without a response if the "motion and the files and records of the case conclusively show that the prisoner is entitled to no relief . . . ." *Accord Wright v. United States*, 624 F.2d 557, 558 (5th Cir. 1980)[1] (finding the summary dismissal of a Section 2255 motion was proper "[b]ecause in this case the record, uncontradicted by [defendant], shows that he is not

---

[1] Unless later superseded by Eleventh Circuit precedent, a Fifth Circuit decision issued before October 1, 1981, binds this court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*).

entitled to relief"); *Hart v. United States*, 565 F.2d 360, 361 (5th Cir. 1978) ("Rule 4(b) [Rules Governing § 2255 Proceedings], allows the district court to summarily dismiss the motion and notify the movant if 'it plainly appears from the face of the motion and any annexed exhibits and the prior proceedings in the case that the movant is not entitled to relief . . . .'"). *See United States v. Deal*, 678 F.2d 1062, 1065 (11th Cir. 1982) (citing *Wright* and *Hart*).

## FACTS[2]

> [I]n the Middle District of Florida and elsewhere, defendants Damian Ruiz-Lopez, Justin Lugo, and Dani Munoz-Guzman conspired with separately charged Miguel Perez and others to obtain money from financial institutions by means of fraudulent representations using counterfeit credit and debit cards. Specifically, defendants were part of a criminal "carding" group in the Tampa Bay area that purchased stolen credit card and debit card information, along with account holder names and postal zip codes, from an online website with the initials VM. The conspirators then used a laptop and a card encoder to re-encode used gift or other cards with the stolen information. The conspirators used the counterfeit credit and debit cards to purchase fuel (or other items) from area gas stations and retail locations, including at Sam's Club. Conspirators typically filled their vehicle's tank with fuel, and then filled a secondary bladder, or a storage container, with fuel. Members of the organization then sold the fuel at a discounted rate to truck drivers, converting the stolen fuel into cash. The conspirators used 639 different credit and/or debit cards as part of the group, causing $170,571.49 in actual loss to the financial institutions and/or individual victims. The 639 counterfeit credit and/or debit cards had a total credit limit/available balance of $1,969,243.96.
>
> The conspirators in this case usually purchased their stolen credit and debit card information from the VM website. It is an invitation only website, where you must be recommended by another member in order to receive a username and password. VM appears similar to the E-Bay website, but it is exclusively

---

[2] This summary of the facts derives from the plea agreement. (Doc. 64 at 17–22)

dedicated to criminal purposes — the website sells stolen credit card and debit card information. The slogan for the site is "Private Information Sellers & Magnetic Stripe Kings." The site boasts that it has over 3 million stolen American credit and debit card numbers, and that its card data is 95% valid. The vendors on the website are typically computer hackers, many of whom are of Russian or Ukrainian background. To fund a VM account, the user must send money to designated recipients, typically in the Ukraine. In order to thwart law enforcement efforts, the recipient accounts are typically changed on a regular basis. The website sells "dumps" of credit card and debit card information. The price of the credit card and debit card information depends based on the quality of the information, and for a higher price of about $20, includes zip code information regarding the account holder. More valuable credit and debit card information can be priced even higher depending on the credit limit for the card.

Therefore, as part of the carding scheme, . . . Ruiz-Lopez conspired with Perez, Dani Munoz-Guzman and others to transfer money from inside the United States to locations outside the United States (specifically, the Ukraine) in order to promote the bank fraud conspiracy. In total, records recovered indicate that, as part of the scheme: (1) Perez sent $2,150 via Western Union . . . to recipients in the Ukraine and (2) that Perez, Damian Ruiz-Lopez and Dani Munoz-Guzman and other co-conspirators sent $11,400 via MoneyGram to recipients in the Ukraine . . . .

The money was sent to these recipients to place funds on Miguel Perez's account with the website VM. Those funds were then used to promote the scheme by purchasing additional stolen credit and debit card information to create counterfeit credit and debit cards to facilitate the bank fraud conspiracy.

Lugo, Ruiz-Lopez, and Munoz-Guzman are all on video multiple times purchasing large amounts of gasoline using stolen credit and debit card information as part of the scheme. For example, on July 4, 2013, . . . Ruiz-Lopez made a series of fraudulent purchases of gasoline from a Sam's Club location in Brandon, Florida, using a counterfeit access device and a Sam's Club membership card in Ruiz-Lopez's name. On that same day . . . Munoz-Guzman made a series of fraudulent gasoline purchases from the same Sam's Club location using another counterfeit access device and a Sam's Club membership card in Ruiz-Lopez's name. All of these transactions were captured on surveillance video at the gas station.

Justin Lugo was also captured on surveillance video performing fraudulent transactions. For example, on July 9, 2013, . . . Lugo was captured on video during a series of fraudulent gas purchases at a Sam's Club location in Clearwater, Florida. Lugo also used a counterfeit access device, and also used a Sam's Club membership card in Ruiz-Lopez's name.

Following his arrest on federal charges on May 20, 2014, separately charged Miguel Perez waived his *Miranda* rights and agreed to speak to law enforcement without his lawyer present. Perez admitted that he and co-conspirators had been purchasing stolen credit and debit card numbers on VM and that he had purchased three different card encoders in order to then encode the information on gift cards. Perez said that he and the co-conspirators would then use the counterfeit access devices to purchase gasoline and then resell the gasoline [at a profit]. Perez estimated that he made about $800 dollars a week from the card scheme, and that he would encode approximately two to three cards a week.

Following his arrest on December 17, 2014, Justin Lugo waived his *Miranda* rights and spoke to law enforcement. Lugo told law enforcement personnel that he performed credit/debit card fraud on multiple occasions. Lugo said that on multiple occasions, Perez and/or Ruis-Lopez supplied him with 5–7 counterfeit credit/debit cards at a time, and that Lugo would drive a white pick-up truck outfitted with a bladder to area gas stations and fill the tank and the bladder of the truck up using the counterfeit credit and debit cards. Lugo said that he would then return the truck with the stolen gas to Perez's residence in order to off-load the gas and that then he would repeat the process of purchasing stolen gas. Lugo said that Perez paid Lugo between $50–70 each day, depending on how many trips he made for gas.

Many of the financial institutions defrauded by this conspiracy are federally insured. With respect to the credit unions affected, many of the fraudulent charges were made on cards issued by Suncoast Schools Federal Credit Union, Altra Federal Credit Union, and Navy Federal Credit Union. The deposits of federal credit unions are insured federally by the National Credit Union Share Insurance Fund. In addition, there were fraudulent charges as part of the scheme on cards issued by Wells Fargo Bank, Wachovia Bank, and Bank of America, among others. The deposits of those banks are federally insured by the Federal Deposit Insurance Corporation.

# GROUNDS

Ruiz-Lopez alleges four grounds of ineffective assistance of counsel. The first three grounds involve the calculation of the sentence. The fourth ground alleges that counsel was ineffective for not meeting with him "to discuss movant's desire to appeal the sentence." (Doc. 1 at 8)

**Sentence:**

Ruiz-Lopez alleges that counsel was ineffective for not arguing against (1) a two-level enhancement for the possession of device making equipment (Ground One), (2) a two-level enhancement because part of the scheme was committed from outside of the United States (Ground Two), and (3) a two-level enhancement because the scheme involved money laundering (Ground Three). Ruiz-Lopez waived each claim. Ruiz-Lopez's conviction is based on a negotiated plea, in which he expressly waived the right to appeal his sentence (Doc. 64 at 15):

> The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

Ruiz-Lopez's sentence of seventy months is both below the guidelines range of 97–121 months and neither an upward departure nor above the statutorily authorized maximum sentence of thirty years. Consequently, the waiver of the right to challenge the guidelines sentence controls and, as *Williams v. United States*, 396 F.3d 1340, 1342 (11th Cir.), *cert. denied* 546 U.S. 902 (2005), explains, the appeal waiver precludes a claim of ineffective assistance of counsel at sentencing:

> [A] valid sentence-appeal waiver, entered into voluntarily and knowingly, pursuant to a plea agreement, precludes the defendant from attempting to attack, in a collateral proceeding, the sentence through a claim of ineffective assistance of counsel during sentencing. [A] contrary result would permit a defendant to circumvent the terms of the sentence-appeal waiver simply by recasting a challenge to his sentence as a claim of ineffective assistance, thus rendering the waiver meaningless.

Even if not waived, Ruiz-Lopez's ineffective assistance of counsel claims are meritless. Ruiz-Lopez pleaded guilty to participating in a conspiracy, and as a consequence, each two-level enhancement was properly assessed because he is responsible for his co-conspirators' acts that were committed in furtherance of the conspiracy.

**Appeal:**

In Ground Four Ruiz-Lopez faults counsel not meeting with him to discuss whether to appeal. The analysis of Ruiz-Lopez's claim is principally controlled by *Roe v. Flores-Ortega*, 528 U.S. 470, 476–77 (2000), and *Otero v. United States*, 499 F.3d 1267 (11th Cir. 2007). Ruiz-Lopez claims that his defense counsel was ineffective for not consulting him about appealing. *Strickland* governs a claim that counsel was

ineffective for not appealing. *Roe v. Flores-Ortega*, 528 U.S. at 476–77. *Flores-Ortega* recognizes three categories of claims: (1) counsel fails to appeal even though the defendant unquestionably expresses his desire to appeal,[3] (2) the defendant faults counsel for not appealing even though the defendant directed counsel not to appeal,[4] and (3) the defendant's desire to appeal is not clearly expressed.[5]

In his motion to vacate Ruiz-Lopez alleges that counsel should have known that he wanted to appeal even though he did not expressly direct counsel to appeal. Consequently, Ruiz-Lopez's allegation falls into *Flores-Ortega's* third category, in which the defendant's desire to appeal was not clearly expressed. *Flores-Ortega*, 528 U.S. at 478, suggests how to proceed:

> In those cases where the defendant neither instructs counsel to file an appeal nor asks that an appeal not be taken, we believe the question whether counsel has performed deficiently by not filing a notice of appeal is best answered by first asking a separate, but antecedent, question: whether counsel in fact consulted with the defendant about an appeal. We employ the term "consult" to convey a specific meaning — advising the defendant about the advantages and disadvantages of taking an appeal, and making a reasonable effort to discover the defendant's wishes. If counsel has consulted with the defendant, the question of deficient performance is easily answered: Counsel performs in a professionally unreasonable manner only by failing to follow the defendant's express

---

[3] *Roe v. Flores-Ortega*, 528 U.S. at 477 ("[A] defendant who instructs counsel to initiate an appeal reasonably relies upon counsel to file the necessary notice. Counsel's failure to do so cannot be considered a strategic decision; filing a notice of appeal is a purely ministerial task, and the failure to file reflects inattention to the defendant's wishes.").

[4] *Roe v. Flores-Ortega*, 528 U.S. at 477. ("At the other end of the spectrum, a defendant who explicitly tells his attorney not to file an appeal plainly cannot later complain that, by following his instructions, his counsel performed deficiently.").

[5] *Roe v. Flores-Ortega*, 528 U.S. at 477 ("Is counsel deficient for not filing a notice of appeal when the defendant has not clearly conveyed his wishes one way or the other?").

> instructions with respect to an appeal. . . . If counsel has not
> consulted with the defendant, the court must in turn ask a
> second, and subsidiary, question: whether counsel's failure to
> consult with the defendant itself constitutes deficient
> performance. That question lies at the heart of this case: Under
> what circumstances does counsel have an obligation to consult
> with the defendant about an appeal?

Based on Ruiz-Lopez's allegation, "the heart of this case" is whether "counsel ha[d] an obligation to consult with [Ruiz-Lopez] about an appeal."

Consulting a client about appealing is not constitutionally required in every case. "We cannot say, as a *constitutional* matter, that in every case counsel's failure to consult with the defendant about an appeal is necessarily unreasonable, and therefore deficient." *Roe v. Flores-Ortega*, 528 U.S. at 479 (italics original). *See also Otero v. United States*, 499 F.3d at 1270 ("A criminal defense lawyer is not under a *per se* constitutional obligation to consult with his or her client about an appeal. In some cases, the Sixth Amendment requires such consultation; in others, it does not."). *Flores-Ortega*, 528 U.S. at 480, identifies two situations where counsel is constitutionally required to consult the client about appealing.

> [C]ounsel has a constitutionally imposed duty to consult with
> the defendant about an appeal when there is reason to think
> either (1) that a rational defendant would want to appeal (for
> example, because there are nonfrivolous grounds for appeal), or
> (2) that this particular defendant reasonably demonstrated to
> counsel that he was interested in appealing. In making this
> determination, courts must take into account all the
> information counsel knew or should have known.

As pertinent to the present action, the second situation is easily resolved because Ruiz-Lopez does not allege that he expressed an interest in appealing. The linchpin to the present action is the first situation identified in *Flores-Ortega*,

specifically, would a rational defendant want to appeal. A "highly relevant factor" for consideration is, as *Flores-Ortega*, 528 U.S. at 480, states, whether the defendant pleaded guilty and waived his appellate rights.

> Although not determinative, a highly relevant factor in this inquiry will be whether the conviction follows a trial or a guilty plea, both because a guilty plea reduces the scope of potentially appealable issues and because such a plea may indicate that the defendant seeks an end to judicial proceedings. Even in cases when the defendant pleads guilty, the court must consider such factors as whether the defendant received the sentence bargained for as part of the plea and whether the plea expressly reserved or waived some or all appeal rights.

Ruiz-Lopez received a favorable sentence, specifically, a three-level reduction for acceptance of responsibility and an additional three-level reduction under Section 5.K1.1, United States Sentence Guidelines. After the six-level reduction, the district court imposed concurrent sentences of seventy months, which is the bottom of the applicable advisory guideline range.

The circumstances of Ruiz-Lopez's plea are factually distinguishable from *Flores-Ortega*, which involved neither a plea agreement nor an appellate waiver. As a consequence, trial counsel had a constitutionally imposed duty to ascertain the defendant's wishes because Flores-Ortega had expressed an interest in appealing. Instead, the circumstances of Ruiz-Lopez's plea is factually indistinguishable from *Otero v. United States*, 499 F.3d 1267 (11th Cir. 2007). First, Otero's plea agreement contained an appeal waiver identical to Ruiz-Lopez's.[6] Second, the Magistrate Judge

---

[6] Both Otero's and Ruiz-Lopez's prosecutions originated in the Tampa Division of the Middle District of Florida.

ensured that Otero understood the appeal waiver when Ruiz-Lopez pleaded guilty. Third, accepting Ruiz-Lopez's allegation as true, no additional consultation on the topic occurred after the imposition of sentence. *Otero* assumed that counsel's failure to consult with Otero after the imposition of sentence was a violation of *Flores-Ortega's* consultation requirement, but "conclude[d] that Otero's trial lawyer had no constitutional duty to consult Otero about an appeal and thus did not render constitutionally ineffective assistance by failing to do so." *Otero*, 499 F.3d at 1269. This conclusion was because "under the circumstances of this case, [there was] no constitutional duty to consult in the first place." *Otero*, 499 F.3d at 1269 n.1. The plea agreement and the appeal waiver weigh heavily in the government's favor, as *Otero*, 499 F.3d at 1271, explains:

> In answering the question of whether a rational defendant would want to appeal his sentence, it is relevant to ask whether there are any potential non-frivolous grounds for appeal, whether there was a guilty plea, and whether the plea expressly waived the right to appeal. See *Flores-Ortega, id.* at 480, 120 S. Ct. at 1036. All those factors weigh heavily in favor of the government in this case. The plea agreement signed by Otero contained a typical appeal-waiver provision, pursuant to which Otero "expressly waived the right to appeal his sentence, directly or collaterally, on any ground." This broad waiver contained four exceptions. Those exceptions allowed Otero to appeal (1) "an upward departure by the sentencing judge," (2) "a sentence above the statutory maximum," (3) "a sentence in violation of the law apart from sentencing guidelines," or (4) any sentence if the Government appealed. Otero does not argue that any of these exceptions apply in this case. Therefore, on account of the plea agreement's broad appeal waiver, any appeal taken by Otero would have been frivolous and would have been an appeal that no rational defendant would have taken.

Considering the similarity with *Otero*, Ruiz-Lopez's claim fails "[b]ecause no rational defendant in [his] position would have sought to appeal in light of the broad appeal waiver and because [he] did not communicate to his lawyer a desire to appeal, [his] lawyer was not under a constitutional obligation to consult [him] about an appeal." *Otero*, 499 F.3d at 1271. *See also Devine v. United States*, 520 F.3d 1286, 1288–89 (11th Cir. 2008) (affirming the district court's determination that "no rational defendant would want to appeal" because the sentence "was at the bottom of the guidelines" and the defendant's plea agreement included the standard appeal waiver); *Cuero v. United States*, 269 Fed. App'x 893, 895 (11th Cir. 2008) ("[E]ven if counsel insufficiently consulted with Cuero, it did not amount to ineffective assistance of counsel" because "trial counsel did not have a constitutional duty to consult with Cuero about an appeal.").

Ruiz-Lopez thoroughly discussed the waiving of his appellate rights when he pleaded guilty (audio recording at Doc. 76), and he does not assert to having expressed to his counsel an interest in appealing. No rational defendant would want to appeal after having waived his right to appeal and possibly risk losing a three-level reduction for accepting responsibility, a three-level reduction for cooperating, and a sentence at the bottom of the guidelines range. Based on these facts and the analysis in *Otero*, Ruiz-Lopez's defense counsel had no constitutional obligation after the sentencing to consult Ruiz-Lopez about an appeal.

Accordingly, the motion under Section 2255 to vacate the sentence (Doc. 1) is **DENIED**. The clerk must enter a judgment against Ruiz-Lopez and close this case.

## DENIAL OF BOTH A
## CERTIFICATE OF APPEALABILITY
## AND LEAVE TO APPEAL *IN FORMA PAUPERIS*

Ruiz-Lopez is not entitled to a certificate of appealability ("COA"). A prisoner moving under Section 2255 has no absolute entitlement to appeal a district court's denial of his motion to vacate. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a COA. Section 2253(c)(2) permits issuing a COA "only if the applicant has made a substantial showing of the denial of a constitutional right." To merit a certificate of appealability, Ruiz-Lopez must show that reasonable jurists would find debatable both (1) the merits of the underlying claims and (2) the procedural issues he seeks to raise. *See* 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000); *Eagle v. Linahan*, 279 F.3d 926, 935 (11th Cir 2001). Because he fails to show that reasonable jurists would debate either the merits of the claims or the procedural issues, Ruiz-Lopez is entitled to neither a certificate of appealability nor an appeal *in forma pauperis*.

Accordingly, a certificate of appealability is **DENIED**. Leave to appeal *in forma pauperis* is **DENIED**. Ruiz-Lopez must obtain permission from the circuit court to appeal *in forma pauperis*.

ORDERED in Tampa, Florida, on June 5, 2017.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE